McCORRISTON MILLER MUKAI MacKINNON LLP

RANDALL K. SCHMITT         3752-0
BRETT R. TOBIN              9490-0
Five Waterfront Plaza, 4th Floor
500 Ala Moana Boulevard
Honolulu, Hawai'i  96813
Telephone:  (808) 529-7300
Facsimile:  (808) 524-8293
Email:  schmitt@m4law.com; btobin@m4law.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| KEVIN S. ALBERT AND KIMBERLY LEBLANC ALBERT, TRUSTEES OF THE ALBERT REVOCABLE TRUST UAD 6/3/1997 AND RESTATED 1/7/2020, <br><br> Plaintiffs, <br><br> vs. <br><br> NOELANI YACHT CHARTERS, LLC, a Hawaii limited liability company; JIM JONES; KIMBERLEY KALALANI HIGA; JOHN DOES 1-50; JANE DOES 1-50; DOE PARTNERSHIPS 1-50; DOE CORPORATIONS 1-50; DOE GOVERNMENTAL AGENCIES 1-50; and DOE ENTITIES 1-50, <br><br> Defendants. | CASE NO. <br><br> COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS |

438776.1

## COMPLAINT

COMES NOW, Plaintiffs KEVIN S. ALBERT AND KIMBERLY LEBLANC ALBERT, TRUSTEES OF THE ALBERT REVOCABLE TRUST UAD 6/3/1997 AND RESTATED 1/7/2020 ("Trust" or "Plaintiffs"), by and through their attorneys, McCorriston Miller Mukai MacKinnon LLP, and allege as follows:

## PARTIES

1.      The Trust is a duly registered revocable trust with residence in the State of New Mexico.

2.      Defendant NOELANI YACHT CHARTERS, LLC ("Yacht Charters") is a limited liability company registered in and with its principal offices in the State of Hawai'i.

3.      Defendant JIM JONES ("Jones") is a resident of the State of Hawai'i.

4.      Defendant KIMBERLEY KALALANI HIGA ("Capt. Kim") is a resident of the State of Hawai'i.

5.      Defendants JOHN DOES 1-50; JANE DOES 1-50; DOE PARTNERSHIPS 1-50; DOE CORPORATIONS 1-50; DOE GOVERNMENTAL AGENCIES 1-50; and DOE ENTITIES 1-50 ("Doe Defendants") are persons or entities who in some manner are liable to the Trust for the relief claimed and/or

438776.1

cause of action herein alleged and described and whose true names, identities and

capabilities are presently unknown to the Trust or its attorneys.

## JURISDICTION

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C.

§ 1332 because there is complete diversity between the parties and the amount in

controversy exceeds $75,000.00 exclusive of interest, fees and costs.

7.     Venue is appropriate in this Court under 28 U.S.C. § 1391 because a

substantial portion of the events giving rise to Plaintiffs' claims occurred in this

judicial district.

## STATEMENT OF GENERAL FACTS

### A.     Purchase Agreement

8.     The Trust owns a 94-foot luxury yacht named the Nakoa (hereinafter

"Nakoa" or "Vessel").

9.     Defendants Yacht Charters and Jones purchased the Vessel from the

Trust by way of a Vessel Installment Purchase and Management Agreement dated

December 29, 2022 ("Purchase Agreement").

10.    Defendants Yacht Charters and Jones are in the business of luxury

yacht charters in the Hawaiian Islands.

11.     The purchase price for the Vessel was $1.45 million with this amount to be paid over a time period of fifteen (15) years as secured by various related agreements.

12.     To ensure that the Trust's interests were secured and protected, the Purchase Agreement contained several important duties upon Yacht Charters and Jones (collectively referred to in the contract as the "Buyer") including the following:

### ARTICLE III
### VESSEL MANAGEMENT

**Section 3.01     Management and Operation of the Vessel in the Business.** From the Closing Date until the expiration or earlier termination of this Agreement (the "Term"), Buyer shall manage and operate the Vessel in the Business and use its best efforts to manage and operate the Vessel in accordance with best yacht management practices and promote the interests of Seller in all matters relating thereto. Without limiting the generality of the foregoing, at all times during the Term, Buyer shall provide the management services set forth on Exhibit G attached hereto (the "Services").

**Section 3.02     Operation in Compliance with Law.** At all times during the Term, Buyer shall operate, man, and maintain Vessel in accordance with all applicable statutes, laws, ordinances, regulations, rules, codes, constitutions, treaties, common law, governmental orders, other requirements, or rule of law of any governmental authority (collectively, **"Laws").**

**Section 3.05     Manning Requirements.** Buyer shall at all times man the Vessel with a sufficient number of competent and properly licensed crew and/or deckhands trained and experienced in the operation of the Vessel in the waters in which the Vessel is to operate under this Agreement. Buyer shall cause the crew of the Vessel to carry out their duties with due care and workmanship and the utmost dispatch and diligence. Buyer warrants that the crew to be

438776.1                                                   3

provided by Buyer shall meet legal manning requirements in accordance with applicable Law for uses and purposes of the Vessel required under this Agreement. The Vessel's crew shall be Buyer's employees at all times. Buyer shall pay all wages, fringe benefits, applicable taxes, expenses, and applicable fees and taxes required for the Vessel's crew.

**Section 3.10    Restrictions on Buyer's Use of Vessel.** Prior to the Transfer of Title, Buyer shall not take, or permit to be taken, any of the following actions with respect to the Vessel:

(a)    use the Vessel for any purpose other than as expressly provided for in this Agreement;

(b)    operate the Vessel in violation of applicable Law;

(c)    modify the Vessel in any way without the prior written consent of Seller;

(d)    relocate the Vessel to any location other than the Hailing Port;

(e)    lease, sell, transfer, or assign the Vessel or any component thereof to any person or entity;

or

(f)    subject the Vessel to any Encumbrance.

**Section 3.11    Risk of Loss.** During the Term, Buyer shall bear all risk of loss, damage, destruction, theft, taking, confiscation, or requisition, partial or complete, of or to the Vessel or its use, however caused or occasioned. Buyer shall notify Seller in writing within five days of learning of any such loss.

\* \* \*

## ARTICLE V
## DEFAULT

**Section 5.01    Events of Default.** Each of the following events is an "**Event of Default**" under this Agreement:

(b)     if Buyer defaults in the observance or performance of any other term, covenant, or condition of this Agreement, on Buyer's part to be observed or performed, and Buyer fails to remedy such default within 30 days after notice by Seller to Buyer of such default, or if such default is of a nature that it cannot be remedied within said period of 30 days, if Buyer does not commence within said period of 30 days, or does not thereafter diligently prosecute to completion, the steps necessary to remedy such default;

(c)     if Buyer fails to observe or perform any term, covenant, or condition on Buyer's part to be observed or performed under any agreement with Seller other than this Agreement, including the Installment Note, the DP Note, or the Seller Note, and such default continues beyond any grace period set forth in such other agreement for the remedying of such default;

\* \* \*

## ARTICLE VI
## INDEMNIFICATION

Buyer and Jones, jointly and severally, shall indemnify, defend, and hold harmless Seller, its affiliates, and their respective successors and assigns and representatives (collectively, **"Indemnitees")** against any and all losses, injury, death, damages, liabilities, claims, deficiencies, actions, judgments, interest, awards, penalties, fines, costs, or expenses of whatsoever kind and nature, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers, incurred by Indemnitees relating to, arising out of, or in connection with the transactions contemplated by this Agreement, including:

(a)     the possession, maintenance, use, condition, repair, return, disposition, operation, storage, or transportation of the Vessel, any parts or components thereof, or any modifications thereto (including latent and other defects, whether or not discoverable by Seller or Buyer), including any related pollution, contamination, environmental impairment, or similar condition;

(b)     any inaccuracy in or breach of any of the representations of Buyer or Jones contained in this Agreement or any document to be delivered by Buyer or Jones hereunder; or

(c)     any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Buyer of Jones pursuant to this Agreement or any document to be delivered by Buyer or Jones hereunder.

The obligations of Buyer under this **ARTICLE VI** shall survive and continue in full force and effect notwithstanding the expiration or earlier termination of this Agreement.

\* \* \*

## ARTICLE VIII
## RETURN OF VESSEL

**Section 8.01 Obligation to Return Vessel.**  In the event Buyer is required to return the Vessel to Seller for any reason hereunder, including upon the occurrence of an Event of Default or the termination of this Agreement, Buyer shall, at its sole expense and risk, return and/or deliver the Vessel to Seller at the Hailing Port or such other location as the parties mutually agree.

**Section 8.02 Condition of Vessel on Return.**  Upon the return of the Vessel, Buyer shall cause the Vessel to be in:  (a) as good condition as when delivered to Buyer and complete with all parts and components, ordinary wear and tear excepted, and (b) in compliance with applicable Law.

## B.     General Information

13.     Upon information and belief, Yacht Charters operates a luxury charter operation based on the Island of Oahu with charters in and around the Hawaiian Islands.

14.     Upon information and belief, Yacht Charters operates another vessel, a 75-foot yacht, the "Noelani", USCG Official Document No. 1171213, berthed on the Island of Oahu.

15.     Upon information and belief, the principals in Yacht Charters are Jim and Isabelle Jones, husband and wife.

16.     Upon information and belief, neither Jim nor Isabelle Jones are licensed vessel captains.

17.     Capt. Kim holds a 100 T U.S. Coast Guard captain's license.

18.     Upon information and belief, prior to February 17, 2023, the Friday before the vessel grounded on February 20, 2023 ("Grounding"), Capt. Kim had captained the MV Noelani but not the MV Nakoa.

19.     On the Vessel's insurance policy, the listed and approved captain was Joe Bardouche ("Capt. Joey") who holds a 100 T U.S. Coast Guard license.

20.     Under the terms of the Vessel's insurance policy, the Nakoa is supposed to be crewed by an approved, licensed captain, a first mate and a crew member.

### C.     Events leading up to the Grounding.

21.     On Friday, February 17, 2023, Jim and Isabella Jones, 4 juvenile family members or friends, Capt. Kim, a first mate and a crew member arrived at the Vessel which was moored in Lahaina Roads.

22.     At the time of their arrival, Capt. Joey was onboard and in operational control of the Vessel but was relieved of those duties by Capt. Kim at the direction of Jones.

23.     After being relieved of his duties, Capt. Joey departed the Vessel for the weekend in preparation for the next vessel charter scheduled for February 20, 2023, a charter which was to begin on the Island of Lanai ("Lanai Charter").

24.     Beginning on February 17th and continuing through the Grounding, Jones was using the Vessel for personal use, not a commercial charter ("Personal Trip").

25.     In the course of the Personal Trip, Jones directed the Vessel to various locations along the coast of Maui including Black Rock, Kapalua Bay and Honolua Bay.

26.     The Vessel moored overnight on both Saturday, February 18th and Sunday, February 19th in Honolua Bay on a mooring ball (believed to have been M1).

27.     Upon information and belief, mooring in Honolua Bay is limited to two and one half (2 1/2) hours per vessel per day with no overnight mooring allowed.

28.     Upon information and belief, neither Capt. Kim nor Jones took the standard precaution of setting a manned mooring or anchor watch while in Honolua Bay but instead relied solely on a digital anchor alarm set by Jones.

29.     Upon information and belief, Capt. Kim had never operated at the helm of the MV Nakoa in Honolua Bay prior to the Personal Trip.

30.     Neither Yacht Charters nor Jones notified the Trust about the Personal Trip.

31.     Neither Yacht Charters nor Jones sought the approval of the Trust for the Personal Trip.

32.     Neither Yacht Charters nor Jones sought to have Capt. Kim approved as a vessel captain for the Nakoa prior to the Grounding.

### D.     Grounding and Salvage

33.     Upon information and belief, around 5:20 a.m. on Monday, February 20, 2023, Jones heard a notification from the anchor alarm on the Vessel.

34.      Upon information and belief, at or around the same time that Capt. Kim, who was on the bridge of the Vessel, noticed that the Nakoa was no longer moored but adrift.

35.     At this point in time, the Vessel was not under power.

36.     Upon information and belief, after getting the engines started and the propulsion and steering engaged, Capt. Kim, Jones and the Vessel's crew

undertook a series of maneuvers but ultimately ran aground in Honolua Bay

ultimately resting on the shoreline.

37.    Upon information and belief, over the next several days, Yacht

Charters, Jones, the State of Hawaii Department of Land and Natural Resources

("DLNR") and the U.S. Coast Guard undertook various steps to defuel the Vessel,

remove its batteries and move the Vessel off the shoreline.

38.    DLNR "federalized" the Vessel on Friday, 24, 2023 and from there

on, DLNR was in charge of the decision-making process relating to the salvage of

the Vessel and its removal from the shoreline.

39.    At no time following the Vessel being federalized by DLNR were the

Trust or the Defendants allowed access to the Vessel to remove valuable

equipment, machinery, or effects including but not limited to the engines, the

transmission, the propellors, the electronic radar and navigation equipment, any of

the galley equipment or any of the furniture or effects associated with a luxury

yacht.

40.    Upon information and belief, the salvage company which undertook

the removal of the Vessel from the shoreline of Honolua Bay did not undertake any

substantive vessel hull repairs and when the Vessel was towed out to sea, it sank in

approximately 800 feet of water off the coast of Maui on Sunday, February 26,

2023 ("Sinking").

41.     DLNR has asserted that the Grounding resulted in some damage to

Honolua-Mokuleiʻia Marine Life Conservation District on the northwest coast of

the Island of Maui ("Conservation District") and that it intends to seek

compensation for the cost of the salvage operations and compensation for any

environmental damage to the Conservation District.

## E.     Default

42.     Following the Grounding, Jones notified the Trust that he had used the

Vessel for personal use over the weekend leading up to and including the

Grounding.

43.     Based on these admissions and other violations of the Purchase

Agreement, the Trust issued a Notice of Default letter to Jones and Yacht Charters

on March 3, 2023.

## COUNT I – BREACH OF CONTRACT
### (Yacht Charters and Jones)

44.     Plaintiffs reallege and incorporate by reference paragraphs 1 through

43 above with the same force and effect as if fully set out in specific detail here.

45.     As detailed herein, both Jones and Yacht Charter had duties and

obligations to the Trust in accordance with the terms of the Purchase Agreement.

46.     Jones and Yacht Charters breached those duties resulting in direct and

proximate damage to the Trust in amounts which will be proven at trial including,

but not limited to, the loss of the Vessel, DLNR claims and fines, the cost of

salvage and environmental damages claims, if any.

## COUNT II – MISREPRESENTATION
### (Yacht Charters and Jones)

47.     Plaintiffs reallege and incorporate by reference paragraphs 1 through

46 above with the same force and effect as if fully set out in specific detail here.

48.     During the term of the Purchase Agreements, Jones and Yacht

Charters have made misrepresentations to, or by omission failed to be truthful

with, the Trust with respect to various aspect of the operation of the Vessel.

49.     These misrepresentations or omissions include failing to notify the

Trust about personal use of the Vessel, failing to obtain permission to use the

Vessel for personal use, substituting an unapproved and unqualified captain to

operate the Vessel and failing to adequately secure the financial interests of the

yacht charter operations to adequately protect the interest of the Trust.

## COUNT III – UNFAIR AND DECEPTIVE ACTS AND PRACTICES
### (Yacht Charters and Jones)

50.     Plaintiffs reallege and incorporate by reference paragraphs 1 through

49 above with the same force and effect as if fully set out in specific detail here.

51.     As detailed herein, Yacht Charters' and Jones's conduct constitutes

unfair and deceptive acts and practices as they were using secured, commercial

assets for purely personal purposes without notice to the Trust and in a grossly negligent manner.

52.     Yacht Charters' and Jones's decisions prior to the Grounding also demonstrate a violation of their individual and collective obligations to act in the best interest of the Trust to fulfill the requirements of the Lanai Charter and there was no way that the Vessel could have been returned to Lahaina, cleaned, reprovisioned and readied for that charter if the Vessel were moored overnight in Honolua Bay for the Personal Trip.

## COUNT IV – EXEMPLARY DAMAGES
### (Yacht Charter and Jones)

53.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 52 above with the same force and effect as if fully set out in specific detail here.

54.     Yacht Charters' and Jones's conduct with respect to the Grounding was grossly negligent, willful, and demonstrated a wanton disregard for the consequences of their actions in that there was no preparation for the weather conditions which were expected and  none of the standard maritime practices for the safe operation of the Vessel were followed including properly setting the mooring and regularly checking the mooring.

55.     Further evidence of this misconduct was the decision by Yacht Charters and Jones to violate the mooring restrictions in Honolua Bay.

438776.1                                                13

56.     This grossly negligent and willful and wanton misconduct occurred in

a marine life conservation sanctuary with a captain who was not trained or

equipped to handle the situations which could have been expected might occur.

## COUNT V – NEGLIGENCE
### (Jones and Capt. Kim)

57.     Plaintiffs reallege and incorporate by reference paragraphs 1 through

56 above with the same force and effect as if fully set out in specific detail here.

58.     Both Jones and Capt. Kim owed the Trust a duty of care in the

planning, preparation, and operation of the Vessel during the Personal Trip.

59.     Capt. Kim, as a licensed U.S. Coast Guard captain, had a duty to the

Trust to ensure that he was properly trained and acquainted with the maneuvering

and operation of the Vessel before taking on the responsibility for operating and

maneuvering the Vessel.

60.     Capt. Kim and Jones both owed the trust the duty to ensure that they

and the Vessel observed and obeyed all laws, regulations, and restrictions with

respect to the operation of the Vessel during the Personal Trip.

61.     Jones and Capt. Kim, individually and collectively, failed in these

duties.

62.     As a direct and proximate result of their individual and collective

negligence, the Trust has suffered damages in an amount which will be proven at

trial but include the loss of the Vessel, the funds due and owing under the Purchase

Agreement, and all environment and salvage damage.

**COUNT VI – MARITIME LIEN**
**(Yacht Charters)**

63.     Plaintiffs reallege and incorporate by reference paragraphs 1 through

62 above with the same force and effect as if fully set out in specific detail here.

64.     In accordance with the terms of the Purchase Agreement, Yacht

Charters warrants and secures the amounts due and owing and the obligations of

the Buyer with its own assets including but not limited to the MV Noelani and its

other assets.

65.     Therefore, a maritime lien exists on those assets including specifically

the MV Noelani.

**PRAYER FOR RELIEF**

WHEREFORE, the Trust asks that this Court grant it the following relief:

1.     Judgment in its favor on all counts.

2.     Damages for the loss of the Vessel in an amount to be proven at trial

but not less than $1.45 million.

3.     Damages for the cost of salvage in an amount to be proven at trial but

not less than $500,000.

4.      Damages for environmental damages and other assessments by the State of Hawaiʻi and the U.S. Coast Guard in an amount to be proven at trial but not less than $500,000.

5.      Damages awarded in accordance with HRS Ch. 480 (treble damages).

6.      Exemplary damages in the event that HRS Ch. 480 damages are not awarded.

7.      Attorneys' fees and costs in accordance with the Purchase Agreement and HRS Ch. 480.

8.      The recognition of a maritime lien on the MV Noelani.

9.      Such other and further relief as this Court may deem just and proper.

DATED: Honolulu, Hawaii, March 13, 2023.

 /s/ Randall K. Schmitt
RANDALL K. SCHMITT
BRETT R. TOBIN
Attorneys for Plaintiffs